HARLEY B. KLINE, *ET AL.*, PLAINTIFFS-APPELLANTS, v.
NEW JERSEY RACING COMMISSION, *ET AL.*, DE-
FENDANTS-RESPONDENTS.

Argued June 11, 1962—Decided July 2, 1962.

110

*Mr. James Hunter, III,* argued the cause for plaintiffs-appellants (*Messrs. Archer, Greiner, Hunter & Read,* attorneys).

*Mr. Evan Wm. Jahos,* Deputy Attorney General, argued the cause for defendants-respondents, New Jersey Racing Commission, Thomas J. Brogan, Hugh J. Strong, Hugh L. Mehorter, Richard V. Mulligan and Charles J. Sheehan (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Jahos,* of counsel).

*Mr. Robert N. Wilentz* argued the cause for all other defendants-respondents.

*Mr. Frank J. Ferry,* attorney for defendant-respondent, argued for Atlantic City Racing Association.

*Mr. Samuel P. Orlando,* attorney for defendant-respondent, argued for Garden State Racing Association.

*Messrs. Wilentz, Goldman, Spitzer & Sills,* attorneys for defendant-respondent, Monmouth Park Jockey Club.

The opinion of the court was delivered by

SCHETTINO, J. Plaintiffs are residents and property owners in Camden County. They instituted this proceeding in lieu of prerogative writ challenging the validity of *L.* 1962, *c.* 17 (hereafter "Chapter 17") and seeking to prevent defendants from conducting horse running races on the 30 additional days for 1962 which are authorized by that act. On cross motions for summary judgment the trial court entered judgment for defendants. Plaintiffs appealed to the Appellate Division. We certified the appeal before the argument was heard in the Appellate Division.

In March 1962 a particularly heavy storm caused considerable damage along the Atlantic shore area in our State. Means of raising funds to aid in rehabilitating the damaged public facilities were discussed and proposals were offered to finance these projects by tax revenues derived from a one-time extension of the horse racing season.

As a result, Chapter 17 was passed by the Legislature and was approved on March 29, 1962 by the Governor, effective upon approval. It expressly amends four provisions of the Racing Act, *N. J. S. A.* 5:5–22 *et seq.,* and in so doing it conforms to *Art.* IV, § 7, *par.* 5 of the *New Jersey Constitution* by reciting the amended provisions in full. The amendments to *N. J. S. A.* 5:5–44 and 5:5–47 increase from 50 to 60 days the number of days per year on which licensed owners of harness racing tracks may hold harness races. *N. J. S. A.* 5:5–64 is amended to increase the percentage of the bets which may be withheld from any

pool for winners. The amendment to *N. J. S. A.* 5:5–66 increases the percentage payable to the State from each horse running race pari-mutuel pool in 1962.

However, other provisions of Chapter 17 are completely new and commence with Section 5 (*N. J. S. A.* 5:5–79) which provides:

"Notwithstanding any of the provisions of the act to which this is a supplement, the commission may grant a special permit, upon joint application of the holders of the outstanding permits authorizing running races in this State, for the holding or conducting of a special running race meeting at one or more of the otherwise authorized running race tracks on such days, other than Sunday, during the entire calendar year of 1962 as the commission may designate. Such special running race meeting shall not exceed 30 racing days in the aggregate during such calendar year."

Shortly after the passage of Chapter 17 all three holders of the outstanding regular permits for horse running races made an oral joint application for such a special permit to the chairman of the Racing Commission. The Racing Commission met on April 4 and adopted a motion to allot "emergency racing days" to Monmouth Park Jockey Club and Garden State Racing Association, two of the three holders of the regular permits for horse running races, by "supplemental permit to the prior issued permit." A companion resolution declared that a "supplemental permit be and hereby is granted" to Monmouth for racing from June 1, 1962 to June 7, 1962 and to Garden State from October 3, 1962 to October 5, 1962 and from November 12, 1962 to December 5, 1962. No special permit in writing was issued at that time.

At a meeting held on April 11 the Commission decided to delay issuance of any special permit until a joint *written* application was made by all three holders of the regular permits for horse running races. Such an application, under date of April 13, was received by the Commission on April 16. At the next meeting of the Commission, held on April 19, the Commission adopted a motion "to re-open

the approval of the minutes of the meeting of April 4th." Several amendments to those minutes were adopted and the written joint application was called to the attention of the Commission. Then the special permit was presented to the Commission for signature and executed. Thus, although it is dated April 4, the special permit was actually issued on April 19. It expressly indicates that it provides for a "running horse race meeting," pursuant to and subject to the provisions of the new act.

At oral argument plaintiffs conceded that the Legislature has the power to provide for a special meeting and a special permit substantially as it purported to do in Chapter 17. But they assert that Chapter 17 violated the *New Jersey Constitution, Art.* IV, § 7 in respect to: (1) *par.* 4, relative to the adequacy of the title; (2) *par.* 5, relative to the sufficiency of the procedure for amending statutes; and (3) *par.* 9, relative to private, special and local laws.

Plaintiffs also contend that all of the requirements for the issuance of a special permit under Chapter 17 were not met. We will consider this issue before discussing the constitutional challenge.

I.

Section 5 (*N. J. S. A.* 5:5–79) begins with the statement that "Notwithstanding any of the provisions of the act to which this is a supplement, the commission may grant a special permit * * *." And Section 9 (*N. J. S. A.* 5:5–83) provides:

"Except to the extent the provisions of this act are *inconsistent* therewith, the provisions of the act to which this is a supplement shall apply in their entirety to any *special running race meeting* and any *special permit holder.*" (Emphasis added.)

Plaintiffs' claim that the requirements of Chapter 17 for the grant of the special permit were not met rests upon the postulate that Chapter 17 should be construed to make

applicable to the application for the special permit all of the requirements contained in the Racing Act for the issuance of a regular permit. Upon this premise they contend that the application here made did not meet the following provisions of the Racing Act: *N. J. S. A.* 5:5–38, providing that applicants must supply, by verified application, detailed information regarding directors, owners of all stock, etc.; *N. J. S. A.* 5:5–39, requiring a deposit in the amount of $10,000; *N. J. S. A.* 5:5–39.1, requiring a public hearing with subsequent referendum at a general election in the county and municipality where the race meeting is to be held; and *N. J. S. A.* 5:5–46, requiring a $100,000 bond.

The premise for this challenge is unsound. We think it plain that Chapter 17 does not contemplate compliance with these provisions of the Racing Act. Chapter 17 does not expressly call for such compliance. Nor can we infer it. On the contrary, since Chapter 17 requires the special permit to be granted only to holders of regular permits, there was no reason to require those holders to re-establish their qualifications. Moreover, as plaintiffs themselves concede, the purpose of Chapter 17 would be defeated by that construction of it; for it would be impossible to meet the terms of *N. J. S. A.* 5:5–39.1 in time to achieve the racing meeting in the year 1962, the year in which the meeting must be held under the terms of Chapter 17. Hence we are satisfied that the provisions of the Racing Act to which plaintiffs refer are unconnected with the provisions of Chapter 17 and therefore are inapplicable to the grant of a special permit.

With reference to the argument that the Racing Commission did not follow the express procedures set forth in Chapter 17, nothing in that Chapter requires the "joint application" referred to in Section 5 of that Chapter (*N. J. S. A.* 5:5–79) to be in writing (even though it would seem that the advisable practice would be to require a writing). Even were this not so, however, the actions

116

of the Commission at its meeting of April 19 make it sufficiently clear that the Commission intended to incorporate
by reference its action of April 4. This action, coupled
with the other April 19 proceedings, fulfilled the requirements of Section 5.

II.

We turn then to the constitutional challenges.

 Plaintiffs assert Chapter 17 accomplishes amendments
of the Racing Act without meeting the mandate of *Art.* IV,
§ 7, *par.* 5 that the section amended "shall be inserted at
length" in the amendatory act.

As we understand plaintiffs, this contention is alternative
to the proposition that the several sections of the Racing
Act, considered in "I" above, apply to the issuance of a
special permit. The point made is that if those sections
do not apply (and we have held they do not), then it must
follow that Chapter 17 in fact amended those sections and
hence those sections should have been set forth in full
with appropriate amendatory language. Otherwise stated,
plaintiffs say those sections should have been repeated at
length with something added thereto in the nature of a
proviso that each such section shall not apply to the issuance
of a special permit for the year 1962. No authority so
holding is cited.

Chapter 17 is complete and self-sufficient in the light of
the purpose it seeks to achieve. We see no evil whatsoever
in the format used within the contemplation of the constitutional provision.

 We consider next plaintiffs' assertion that Chapter 17 violates *Art.* IV, § 7, *par.* 4 which reads:

"To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and
that shall be expressed in the title."

In *State v. Zelinski*, 33 *N. J.* 561, 565 (1960), we pointed out that the purpose of this constitutional requirement is to prevent frauds upon legislation by means of uncertain, misleading or deceptive titles to statutes. The test is whether the title is such that thereby the members of the Legislature considering the proposed legislation, are given notice of the subject to which the act relates and the public is also informed of the kind of legislation which is under consideration. If the general subject matter is fairly expressed, the constitutional mandate is satisfied.

The title of Chapter 17 reads:

"AN ACT to amend and supplement 'An act creating the New Jersey Racing Commission and defining its powers and duties; providing for the granting of permits and licenses for the operation of race meetings whereat the running, steeplechase racing or harness racing of horses only may be conducted; providing for the licensing of concessionaires and operators and their employees; regulating the system of pari-mutuel betting and fixing the license fees, taxes and revenues imposed hereunder and fixing penalties for violations of the provisions of this act,' approved March 18, 1940 (P. L. 1940, c. 17), as said title was amended by chapter 137 of the laws of 1941 and making an appropriation therefor."

The title here fairly expresses the general subject matter —horse racing—and neither the legislators nor the public would be led to believe otherwise.

With reference to plaintiffs' claim that *Art.* IV, § 7, *par.* 9 has been violated, we note that in *Harvey v. Essex County Board of Freeholders*, 30 *N. J.* 381, 389 (1959), we said:

"In deciding whether an act is general or special, it is what is excluded that is the determining factor and not what is included. [Citation.] If no one is excluded who should be encompassed, the law is general. Another requirement of a general law is that it must affect equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves."

Chapter 17 deals with all of the holders of regular permits for horse running races. The question is whether it was

arbitrary to make them the only members of the class qualified to receive the special permit. The reasonableness of a classification must be judged in the light of the legislative objective. Here, that objective was a special running for a single year, 1962. It was well within the constitutional discretion of the Legislature to conclude that the regular permittees, and they alone, would accomplish the legislative aim. The classification is therefore unassailable before us.

Apparently in connection with these constitutional challenges, plaintiffs assert it was error for the trial court to exclude their offer of the 22nd Annual Report of the Racing Commission, dated December 31, 1961, in which there was recommended that there be a permanent amendment of the Racing Act permitting "at least nineteen additional racing days." We are unable to understand the relevancy of that offer. We gather that plaintiffs seek to challenge the motives of the Legislature along the line that, while Chapter 17 purports to seek revenues in connection with storm damages, the statute is really a step toward achieving the recommendation in that report. If all of this be assumed, it would not follow that there was a constitutional barrier to *Chapter* 17. The Legislature concededly could provide for the special racing season. That *Chapter* 17 may have been viewed by any legislator as the forerunner of some other act of legislation is of no constitutional significance.

Affirmed, no costs.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.